Jeffrey Miller, Lewis, Brisbois, Biscard, and Smith, on behalf of Defendant and Appellant Exel, Inc. I'd like to reserve three minutes for rebuttal, if I could do that. MS. MOUTAL, DEFENDANT, EXEL, INC. Sure. Just keep track of your time, please. MR. MOUTAL, DEFENDANT, EXEL, INC. Your Honor, we've obviously had extensive briefing, but I want to touch on two things that I think are critical here. The first thing is the legal sufficiency of the $4 million punitive damages verdict and why, in my view, the evidence taken as a whole, with proper inferences, does not rise to the level to justify punitive damages. And second, related to it, and that is that the jury nor the district court should have considered post-collision, post-accident evidence in determining punitive damages. JUDGE LEBEN Let me just interrupt you. I want to make sure I understand. You agree with the district court's summary of the evidence in its ruling on the renewed motion for judgment as a matter of law. You just disagree with its finding that the evidence supports punitive damages. Is that right? MR. MOUTAL, DEFENDANT, EXEL, INC. I have to be as clear as I can on that. There are improper inferences, in my view, that are taking it beyond and it's speculative. But as a whole, I think we need to add up everything that you're entitled to and then see whether it rises to that level. The biggest thing I found in looking at the… JUDGE LEBEN Counsel, can I just interrupt there? Because you said you think that the district court drew improper inferences, but my understanding of the standard review here is that we are supposed to draw all reasonable inferences in favor of the non-moving party and we're not supposed to re-weigh the evidence or disregard evidence favorable to the moving… that we're not supposed to, you know, re-question what the inferences that the district court drew because the district court was in the best position to weigh the evidence, weigh credibility, draw inferences. So how can… if your argument is that improper inferences were drawn, is that even something that we can consider? MR. MOUTAL That is the general rule you're citing, Your Honor. But, in fact, the Wolf case that we've cited, the rule is that you're entitled to reasonable inferences. And by reasonable inferences, I mean probability. If you have an inference that has equal possibility, then they're not entitled to necessarily agree on all things. And there are numerous examples of that in this record. And I think one of the problems that we're facing is what is the role of the court? And when I read the briefs, the first thing I saw was they said that there was a… we made a misstatement of what the standard is in Oregon, that, you know, you shouldn't be looking at things like outrageous conduct that we cited a case on intentional infliction of emotional distress, that the only thing you need to look at here is negligence and then plus aggregating factors. But it's not that simple in Oregon. And I have a case, the Anders case that was cited by the Supreme Court. And what it says is that the court has a very, very important judicial role. And it has to determine whether there's sufficient pattern of conduct that provides a factual basis to support punitive damages. And we said under the statute itself, it says it has to be outrageous indifference. And so we cited cases saying intentional infliction of emotional distress talks about things like intolerable to society, things that cannot be functioning. And what the Supreme Court said was, I'm going to quote this because I think it's very important, that role, and by meaning that role, it's meaning the court's role, is rather analogous to the court's role in the tort of intentional infliction of severe emotional distress, which also involves jury evaluation of conduct under social norms that allude precise or quantified statement. That's exactly right. This is a very high bar we're looking at here with punitive damages. It is, especially if you're talking about taking a verdict away. But here's my problem. And I want to tell you both this so you can have every opportunity to respond. The flavor of the briefing, and it's an excellent briefing, really goes to suggest that there's sort of a kernel of what you think was fair game to be considered, and then a bunch of other prejudicial, especially post-accident conduct. So my question is, but you don't, we're not ruling on an evidentiary question, right? So it's all in, and the jury heard it. And if the kernel of evidence could have risen, a reasonable jury could have decided that it rose to that level, then I'm not sure that any of the rest of the evidence that you object to really matters. And so, as a legal proposition, and so when I look at the kernel, what I'm calling the kernel of evidence, there's, I think uncontested, that the vehicle was driving, well first of all, it was an 18-wheeler, a big vehicle, and it was at four miles above the speed limit. And then I think very significant to me is that the jury heard that for several miles, people traveling behind him saw him appearing to cross the fog line and then jerking back. So I would imagine that many of us have had that experience of realizing that our attention has been taken away, for whatever reason, whether it's the radio or falling asleep or whatever, and jerking back. And the problem is he's not just driving, you know, a small vehicle, he's driving this 18-wheeler. And he's a professional driver, and he didn't pull over, he continued on for several miles. So what about that? Why couldn't a jury be outraged by that? Well, Your Honor, I think what we need to, again, look through the focus of the relevant statute, which is 31.730. And what's interesting about the statute, it's in the negative. It says punitive damages are not recoverable in a civil action unless proven by clear and convincing evidence. And the judge himself said that means highly probable. Second, either acted with malice or shown a reckless, outrageous indifference to highly unreasonable risk of harm. And I really emphasize outrageous because it wasn't emphasized in the other side's brief. It's not just indifference, it's not just reckless, it's outrageous. And third, acting with a conscious indifference, which is, to me, we can call it mens rea, we can call it mental state, what is required to make the person truly culpable. Right, and that's why it seems to me to be so important that the jury heard testimony that this conduct about kind of jerking the wheel back over went on for miles without him stopping. Do I misunderstand the answer? No, no, but the burden is on them. And it has to show highly probability to rise to the level. There are a lot of gaps in this evidence. I mean, we know... Don't you have to show us that no reasonable juror could decide that this was conduct that satisfied that standard that I think you've correctly quoted? Yes, it does not rise to the level. And it's the court's role that the jury is, it's a factual question. I'm not denying that. But the role is for the court as well. Well, let me ask you, I guess what I'm trying to understand here is that this looks like on the road to serious risks. Are you arguing that because the evidence suggests that he was speeding, weaving, failing to see signs and crossing the fog line into plaintiff's bike lanes that Tisdale was dozing as opposed to consciously driving that way? And that because he was dozing that no reasonable juror could have found that his conduct showed a reckless and outrageous indifference to a highly unreasonable risk of harm? I think it's a very good question because it shows the problem. Gaps in evidence. We don't have it. We don't know why he did it. We have a lot of missing things here. Well, let me ask you this. If someone's driving a 16-wheeler and he's driving like that, does it matter if he's dozing or if he's consciously doing that for purposes of deciding whether or not this was outrageous, reckless, indifference to a highly unreasonable risk of harm? Well, I think so, Your Honor. I mean, if you look... So if he's driving for several miles dozing, you don't think that supports a finding of if he's doing it intentionally, then that does? Is that what your argument is? No, I'm going to respond to that with the Smith v. Williams case, which is a Supreme Court case. What that is saying is when it comes to sleeping cases... Sleeping driving cases? In other words, sleeping driving cases, there's always something more. And that's the mens reda we're talking about. That's the state of mind. So, for example, the driver has been up all night and knows that and drives anyway. That's the something more. Maybe the something more is he's a professional driver, that this went on for miles and he's driving an 18-wheeler. I mean, he's driving an 18-wheeler. Your Honor... There's a very small margin for error if he hits anything. He's so lucky these people weren't killed. And let me add one other thing to Judge Christian's hypothetical. He's been doing it for miles, so he knows he's dozing. It isn't like he just happened once and this is the first time. Wouldn't that put him on notice that I'm driving this vehicle and I've got other vehicles on the road with me? Your Honor, I don't know if the evidence supports that. There's so many gaps. We don't know exactly how far over the line he was. We don't... This is a really important point, and my question may have felt hostile to you, but it was a sincere one. I want to make sure I'm not misunderstanding the evidence, because my understanding of the evidence is that folks traveling behind him thought that this conduct of crossing the line, to some extent, went on for several miles. Is that right? The testimony, as I understand it, was approximately two miles. But what the gap is, Your Honor, is how consistent was it? I mean, was it continually like this? Was it just slightly over? The bottom line is that there's nothing to show that he knew in this record that he was over the line. There was testimony that there was difficulty seeing the line. Why is it unreasonable for the jury to understand from the circumstantial evidence that he recognized that and that's why he was jerking back? And I guess I don't know how many times they reported seeing that happen. You've clarified for me that it went over the course of two miles, which is very helpful. Right. If the record, for either one of you, if the record tells us how many times they saw that, I would find that helpful for my scorecard. But that seems to me to be the difference in terms of your standard in Oregon, you know, the consciousness of the action. In my view, there's a very, very important aspect, again, of remembering that like intentional infliction of emotional distress, it has to be outrageous and it has to be conscious. The evidence isn't there on whether he knew he was going over the line. But this goes to my circumstantial evidence question. Why else would the truck be jerking back if it weren't that he was recognizing that he was across the line and scooting back into it? We don't know, Your Honor. The record is silent. Okay, fair enough. But why wasn't the jury permitted to rely upon the circumstantial evidence that they did here? It can rely, Your Honor, on evidence that it hears. But, you know, for example, Mr. Carrillo said, I think he may have been sleeping. That is utter speculation. We don't have anything to support that whatsoever. And as I was saying about sleep cases — Let me interrupt you. I'm sorry. I apologize. Either he's sleeping or he's doing it intentionally. Either way, he did it for a couple of miles and the witnesses who saw it had the impression that he was sleeping. Isn't that sufficient evidence for them to say that? I'll take it one step at a time, Your Honor, to answer that. Again, what sleep cases require is something to indicate to the driver that he knows he shouldn't be driving. In other words, he's overly tired. There's cases that say that — Let me interrupt you, Your Honor. I apologize. How many miles does he have to drive before there's enough evidence to support this? Your Honor, it supports that he was off the road. Does it rise to the level that we're talking about under this statute? It supports that he was off the road, and we don't know if he was sleeping. It could have been fiddling with his cell phone. It could have been all of that speculation, right? But from what the evidence the jury did present is that it supports that he knew he was off the road, at least circumstantially, and that's why he kept jerking back, right? That's the problem. Because I don't think it matters. I don't think we know whether he was sleeping. And I guess I am agreeing with Judge Reyes. I don't think it matters whether he was sleeping. People make mistakes, and it goes to the idea of violating your standard of care and negligence. I mean, there's a million examples with park issues. Well, let me interrupt you, and I apologize. Wasn't the only person who would know what was going on was him? Yes, and it was not his burden to show punitive damages. Well, can't the jury assume that if he doesn't say what happened, that it was probably not in his best interest? I don't think that's — I think, Your Honor — That's an instruction we give all the time. The burden of proof is to show that high standard and that high probability under clear and convincing evidence. And that's the other problem with this. We're not looking at this from a standpoint of 51 percent versus 49 percent. We're talking about highly probative — this has to be high evidence. And that's the framework that we're dealing with here. Well, if the only person who knows refuses to get up there and explain a good reason for why he's doing this, I think that's some evidence that can be considered by the jury as evidence that was withheld by him for a purpose. Well, Your Honor, I think, again, when we're looking at the import of what the statute is requiring and the high standard that we're looking at on an automobile case — we cited in our brief basically there are nine or 10 cases in the entire state that involve allowing punitive damages in automobile cases. Do any of them involve 18-wheelers? I don't recall that, Your Honor. I think several of them involve something else. As you said, some of them were intoxicated. Some of them were — but he's driving an 18-wheeler. We've got to be extremely careful that we don't mesh the standard of negligence with what we're talking about here, which is to deter and to punish. Do people make mistakes? Yes. And it's bound to happen. The issue is, does it rise to the level? And that's what we're dealing with, I think, Your Honor, and why under these facts there's too many gaps and it simply doesn't rise to the level. We've taken you over your time. You can plan. We'll put two minutes back on the clock when you return for your rebuttal, okay? Thank you. You bet. Counsel? Good morning, Your Honors. I'm Brent Barton on behalf of Plaintiff Respondent Eric Mouton. And Excel's argument across 90 pages of briefing and now 15 minutes of argument can really be distilled into two basic arguments, both of which are fundamentally flawed. First, they disagree with the jury's factual findings. And they make this argument, as we've just heard, by essentially re-litigating evidence. And second, which didn't come up this morning in oral argument, but significantly briefed, is they think that even if the jury was correct, the jury's verdict was simply unfair. That is to say, it violated Excel's due process rights, the punitive damages award. Well, I think the thrust of his briefing that I took away from his briefing is a strong objection to post-accident conduct, being cited by the district court judge. Isn't that fair? Yes, Your Honor. That's part of the evidentiary objection, I'd say, in terms of the first one. They simply think the jury was incorrect. However... Oh, wait a minute. Wait a minute. No, no. Let me talk, if I may, about... Please do. If you could address the post-accident conduct, that would be helpful for me. Please. I'd like to make three points about the post-crash conduct. First two, I suppose, are procedural. The third is dealing with the substance. Number one, I don't know if the objection to that evidence is really before this court in a way that is useful to you. That is to say, it is before the court in a Rule 59 motion. But as this court has noted many times, it's almost impossible to reverse on a Rule 59 motion at this stage of the game. They also attempted to bring it up in a 50B motion, which perhaps would be more useful to this court. But as the district court noted, that was not appropriate in their 50B motion. The district court declined to consider it because it was not raised in the 50A motion. So again, at least for today, even if, pretend the court were to find that somehow they wish that they'd like to address that issue, I just don't know if it's before the court in a way that is actually useful. So that's my first point. Second point, pretend for a moment, my second point relates to harm. As this court has noted in some of the questions, even if that evidence was somehow not appropriate for the jury, there's no showing of harm because the pre-crash conduct was so reprehensible that it could support the punitive damages award. Well, let me interrupt you for a second. I think we heard a minute ago, if I understand Mr. Barton's argument, that it's not so reprehensible because he was just dozing. There's no evidence that he did this intentionally or that he had any conscious awareness that he was creating this risk. How do you respond to that? Your Honor, I cannot respond to that any better than the trial court did in its opinion and order rejecting both the 50B and 59 motions. I think the evidence was significantly worse than Excel acknowledges. And I will also note that Excel made these arguments that it wasn't that bad to the jury. The jury rejected it and so did the trial court, so should this court. Specifically, intentionally setting cruise control above the speed limit in an 18-wheeler. Again, they said a lot of vehicle cases, automotive vehicle. This conduct is very different when speeding in an 18-wheel truck. Number two, again, weaving for approximately two miles before the crash in and out such that they might have been falling asleep. But again, as you know, it really shouldn't matter whether they're falling asleep. Either way, they were speeding and swerving and driving poorly. And third, something that actually hasn't come up yet this morning, but really goes to show to the conscious disregard, is they weren't just doing that in any place. They were doing it in the Columbia River Gorge, just east of Portland, one of our state's great tourist attractions, where there are bikes on the roadway. There are dozens of sites, both westbound and eastbound, more than a dozen in each direction. I think about 28 or 29 total. Warning, bikes are in the roadway. Counsel, could you answer my question before you go on about, I think you've both now told me this occurred over a stretch of two miles of the roadway. Do we know how many times the witnesses said he swerved over the line? No, Your Honor. If I recall correctly, it's Mr. Carrillo's testimony. And I believe he actually said about two minutes. But, you know, we can reasonably call that about two miles. But I'm not so concerned about the distance, about how many instances of swerving. Yeah. No, he described just general swerving, such that he was concerned that he might have been falling asleep. I will also note that the road, but he did not, he did not count them specifically. And of course, the road does curve in these, but the truck was able to keep the curves for the most part, albeit weaving. So again, I think a reasonable jury, could they have found that he was asleep? Potentially, but a reasonable jury also could have found that he was awake, but just driving very poorly while speeding in an 18-wheeler. Either way, it supports punitive damages. I will also note again that he was doing it in a period where he knew or had to have known that there were bikes in the roadway. And he had to have known that because he drove this route every day, five days a week. Every day, his job was to drive this exact stretch of road. And those signs were up, the evidence was, for more than a year. So again, the conduct, even all the pre-crash misconduct, could support this verdict, even if the court wanted to or were to exclude the post-crash conduct. The post-crash conduct is, even if it were error, which it is not, it would be harmless error. And I will note that, again, while the briefing takes a lot of, focuses a lot on the post-crash evidence, the actual trial itself, if you look at the record as a whole, it's really a minor point in the overall, in the overall trial. This was not, there's no reason for this court to assume that the only reason the jury reached its conclusion was because of the post-crash evidence. That's just, that's not supported by the overall record. I will also note, just in terms of now going to the meat of it, like, this issue about post-crash evidence and whether it's admitted is settled law and order. And the definitive case on point, both parties cited, is called Mason v. Householder. And it is, it does allow post, ex-post misconduct into evidence to the jury. In this case alone, actually, Magistrate Beckerman, in response to a motion to strike, wrote an analysis that is the best and most cogent analysis of the admissibility of post-crash conduct that has ever been written. It's better than actually any single Supreme Court opinion. It is really a mouthful piece. And that was, that was when she denied the motion to strike the post-crash conduct that was affirmed by Judge Hernandez in his opinion and order. There was also summary judgment motions on that, both in front of Magistrate Beckerman and again, in front of the trial court. It was also litigated again, pre-trial motion eliminated in the form of directed verdict, in the form of post-verdict, both Rule 50B and 59. This is, I believe, legally speaking, Excel's ninth bite at the apple trying to exclude that evidence. And again, this court should reject it for the same reasons that it's been rejected the eight prior times. Also note, perhaps the fundamental flaw in the evidentiary argument is that it was all made to a jury. And I'll be more specific. It's in Volume 4 of the Executive Record. It's 4 ER 570 through 77. That is to say, a full eight pages of trial testimony, not testimony, argument and closing argument consisted of Excel explaining to the jury why, at least in Excel's opinion, what happened was simply not outrageous enough or reprehensible enough to merit punitive damages. Eight pages. All of the arguments that are being raised here were presented to the jury extensively. The Excel's lawyer, for example, compared what Mr. Tisdale did, the professional driver, to, for example, child abuse. So that's outrageous. That's reprehensible. What Mr. Tisdale did was not. It was, at worst, mere negligence. The jury rejected that argument. So should this. So did the trial court in Rule 59. So should this court. And I would also say, again, all this points to the notion that somehow this was a runaway jury, but it was not. There's really no good reason to think this was a runaway jury, Your Honors. And I would also point to the verdict form. The verdict form here is actually quite revealing. If you look at the verdict form. The jury awarded about five point, excuse me, about one point two six million to Mr. Moutal in economic damages, but they wrote something next to that. They wrote U.S. next to that number because some of the economic damages were in U.S. dollars, some were in Canadian dollars. The court, the party stipulated to an exchange rate and the court instructed them to reduce it to U.S. damages. They did that and they wanted us to know they followed the jury's instruction. They awarded four million dollars in non-economic damages to Mr. Moutal and 400,000 to Ms. Newman. And they awarded exactly four million in punitive damages to Mr. Moutal. This is not a runaway jury. This was a very measured jury that took its responsibility seriously. And let us know that on the verdict form. Your Honors, can I answer any more questions? Would you like me to address the second point regarding the fairness argument that is to say whether this verdict violates due process? Hang on, hang on. I don't think we have any additional questions, counsel. You're not really required to use all your time. No, Your Honor. I will not. OK, let's hear from opposing counsel, please. Your Honor, counsel had mentioned about the post incident, the post accident incident. He cited Mason and I agree with that. That is the key case. The Mason case does hold, though, on page 195, the focus is on the tortious act and the motives at the time of the tortious act, not the after the fact issue, because otherwise you're getting into like character evidence. He's a bad guy. We don't like him. So I think we're going to hold him accountable there. There's another important part to this and it applies here. This is on page 196 and it says negligent acts cannot be converted into a wanton or willful act by defendant using improper means to justify his mistake. And the reason for that is, is when we make mistakes, negligence we call it, we all seek to try to smooth it over. It can't be used to say this guy, oh, he's got a horrible animus. He's got a horrible mindset and he's out to get somebody because that's what we do. And that's what that case says. It's a very important principle. And that's why this kind of conduct should not be allowed and should not was it's really not a part of the process of determining what punitive damages are. Can you give me an example of what kind of conduct you think would be admissible in the situation that would support his state of mind? The post-accident conduct is used to indicate the state of mind of the individual at the time of the event. Yes. Give me an example. What kind of conduct would support that here? You know, a good example is one we cited in our brief, Vandermeer. That was a case where there was a property manager. He had an apartment complex and they had a big room and people were hanging out and he was mad that they were hanging out.  I don't know that, but I'm asking for this particular case. What could have happened at the scene in his conduct after the accident that you think would be legitimately admissible to indicate his state of mind? I don't know, Your Honor, in all honesty. I mean, that would be a hypothetical that I'm not quite sure I know how to respond to because obviously it depends on the facts of the case. But you agree that the law does allow certain conduct after the accident to be admitted if it shows state of mind. And I'm just asking, well, if this doesn't, what would? I don't know. I don't know how to answer that, Your Honor, per se. But just on the, he mentioned speeding. I mean, let's just go back to some reality here. The undisputed facts are that he was four miles per hour over the speed limit, 59 miles per hour in a 55 mile per hour zone on a interstate freeway. If that shows outrageous conduct, then probably 90 percent of the people in this state, that would be sufficient, at least a factor, to go into outrageous conduct. I don't think that's the case. And I think we also know from some of the questioning we heard about the swerving, we don't have details. We don't know how many times he went over. We don't know how far he went over. We don't know any of that because there isn't anything. There is absolutely nothing to support it when we have a critical factor, which is the burden of proof, which is probable, highly probable, clear and convincing evidence. And I'm going to leave you with this. You've heard all this evidence today that supposedly, according to what counsel is referring to, is such a high state of evidence that it justifies punitive damages, which are a windfall in the case where a case where this plaintiff has already recovered $5 million. I'm going to leave you with this. This driver was not cited by the police, not for speeding, not for reckless driving, not for anything. And I think we need to take a look and say to ourselves, does this evidence, based on what it is, rise to the level to justify punitive damages? What was the fact of citation and evidence in the trial, whether he was cited by the police? I'm sorry, Your Honor. The thing you just argued about him not being cited, is that in the record? Yes. In the trial? There's nothing to show that there was any citation whatsoever. No, was it? And the jury knew that. The question is, did the jury know that? Was that in the record? That he wasn't cited? He was not cited, Your Honor. Okay. Someone testified he was not cited. Yes. Okay. Thank you. All right. Thank you. Thank you both for your excellent argument. We appreciate it very much. We're going to stand in recess now, and the court will reconvene at 11 o'clock. All rise. The court stands in recess or is adjourned. Thank you. Bye. Bye.
judges: CHRISTEN, SUNG, Rayes